## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LISA OSLIN,

                                     CASE NO. 15-14126

        *Plaintiff*,                 DISTRICT JUDGE SEAN F. COX
*v.*                                MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 17)

### I.     RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Oslin is not disabled. Accordingly, **IT IS RECOMMENDED** that Oslin's Motion for Summary Judgment, (Doc. 14), be **GRANTED**, the Commissioner's Motion, (Doc. 17), be **DENIED**, and that this case be **REMANDED** to the Commissioner under sentence four of 42 U.S.C. § 405(g).

### II.     REPORT

#### A.     Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Lisa Anne Oslin ("Oslin") claim for a period of disability, Supplemental

Security Income Benefits ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq.*, and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 17).

On October 24, 2012, Oslin filed an application for DIB, alleging a disability onset date of August 14, 2012.[1] (Tr. 245-48). Thereafter, on November 15, 2012, she filed an application for SSI, alleging the same disability onset date. (Tr. 249-52). The Commissioner denied both claims. (Tr. 147-77). Oslin then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on June 5, 2014, before ALJ Regina Sobrino. (Tr. 100-27). At the hearing, Oslin—represented by her attorney, John Brissette—testified, alongside Vocational Expert ("VE") Michele Robb. (*Id.*). The ALJ's written decision, issued September 22, 2014, found Oslin not disabled. (Tr. 83-94). On September 29, 2015, the Appeals Council denied review, (Tr. 1-6), and Oslin filed for judicial review of that final decision on November 24, 2015. (Doc. 1).

### B.       Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of

---

[1] At the hearing, Oslin amended her alleged onset date to March 1, 2013.

2

evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.        Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual

functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Oslin not disabled under the Act. (Tr. 83-94). At Step One, the ALJ found that Oslin had not engaged in substantial gainful activity from her alleged onset date of March 1, 2013, through her date last insured ("DLI") of March 31, 2016. (Tr. 85). At Step Two, the ALJ concluded that the following impairments qualified as severe: "degenerative disc disease, degenerative joint disease, fibromyalgia, hypertension, affective disorder, and an-related [sic] disorder . . . ." (Tr. 85-86). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 86-88). Thereafter, the ALJ found that Oslin had the residual functional capacity ("RFC") to perform sedentary work with the following additional limitations:

> [O]ccasional climbing, balancing, stooping, crouching, kneeling, and crawling; no concentrated exposure to hazards; simple, routine, repetitive work that is not done at a production rate pace (for example, no assembly line work); involves minimal changes in the work setting (with only occasional minor changes in a routine work setting); and occasional, routine contacts with co-workers, supervisors and the public.

(Tr. 88). At Step Four, the ALJ found Oslin "unable to perform any past relevant work." (Tr. 92). Proceeding to Step Five, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 93).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has reviewed Oslin's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

##### i.    Function Report

On December 20, 2012, Oslin filled out a Function Report. (Tr. 285-92). At that time, she lived in a house with her boyfriend. (Tr. 285). Describing her conditions, she said "my constant back pain makes it impossible to lift anything, bend, or stand or walk. I have to take lots of breaks. I am unable to do what is expected of me. I have difficulty dealing with customers because of my pain level. I have anxiety attacks in front of customers. I have to use the bathroom frequently due to kidney [and] bowel problems and my customers get angry . . . ." (*Id.*). On a typical day, she would "get up [and] take medication, put on heating pad, sit on toilet, back to couch [to] watch TV, take a nap, eat

something simple. Sometimes take a shower or bath depending on the pain level. Spend afternoon between couch [and] walking around [and] heating pad. Eat dinner, watch TV, try to go to bed." (Tr. 286). "I can't sleep because of pain – up [and] down all night, then in the morning I'm exhausted [and] fatigued all day long." (*Id.*).

Oslin marked several difficulties with personal care, noting problems standing in the shower, tending to her hair, and bending to shave her legs, all due to pain. (*Id.*). In preparing food, she stuck to "frozen or prepared food – cereal [and] sandwiches" on a "daily" basis. (Tr. 287). Although she "used to enjoy cooking big meals homemade," she was "unable to [do that] now." (*Id.*). This was also true for house and yard work. "I do not clean much [and] can't do yard work at all – laundry is difficult." (*Id.*). She tried to "do small tasks" but "it takes me all day . . . ." (*Id.*). "My boyfriend helps me with the house work [and] laundry." (*Id.*).

When getting around outside her home, which occurred "rarely," Oslin indicated she could "drive on short trips" but remained "unable to do long distances." (Tr. 288). When shopping for food, prescriptions, and ("rarely") clothes, she usually took "between 1-2 hours" with help from her "boyfriend . . . ." (*Id.*). She retained the capacity to handle money, but she spent "most of my money on prescriptions [and] Dr. bills." (Tr. 288-89).

Among her hobbies she counted watching television and movies, reading, and playing cards. (Tr. 289). She used to enjoy "skiing, boating, camping, snowmobiling, but I can't do any of those anymore . . . ." (*Id.*). On "special occasions," she visited friends and family; this occurred about once or twice a month. (*Id.*). Although she "g[o]t along with everyone," she admitted that on occasion "I have a short fuse when I am in severe

7

pain and I snap at [others] for no reason . . . ." (Tr. 290). In general, "I really don't go out anymore or get together with friends like I used to." (*Id.*).

Oslin then itemized the abilities that her conditions affected: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, and using hands. (*Id.*). Over the preceding two years, she used a brace for her back and knees. (Tr. 291). "I can walk 15 min to 20 min" before having to rest "5 minutes." (Tr. 290). She could follow instructions "OK," but sometimes would "get confused" or "easily forget spoken instructions." (*Id.*). She denied an ability to handle stress, adding that she had "panic attacks and [irritable bowel syndrome] and my conditions get worse." (Tr. 291). "I have a constant fear of dying . . . because of how I feel all the time [and] I figure I will die young." (*Id.*).

### ii.       Oslin's Testimony at the Administrative Hearing

At her hearing, Oslin confirmed that her "last day of employment was March 14th of . . . 2013." (Tr. 104). She stopped working there because "I just couldn't take the pain in my back anymore, and I tried as long as possible, but it just was unbearable at that point and I couldn't do it anymore." (Tr. 105). "I'm in pain no matter what I do, if I sit or stand. It's a constant daily thing." (*Id.*). If she went to the grocery store, she could only stay for "maybe 15 minutes" before needing to leave and stay "off my feet for a couple of hours." (*Id.*). Sometimes she would fall and injure her knee, "and when I'm injured I'll use [a] cane until I can get my knee healed." (Tr. 106). She also testified to "constantly fidgeting," and being able to sit for "half an hour" before needing to stand. (*Id.*).

8

Asked what she could lift, carry, push and pull, Oslin indicated that anything heavier than "a gallon of milk is too much. . . . Pushing and pulling is hard just because it pulls on my lower back and puts strain." (*Id.*). She also had difficulty using her hands, and "dropped things a lot" due to "arthritis" that caused "things [to] just slip right out of my hands at times." (Tr. 106-07). She claimed pain when bending at the waist, climbing stairs, and crouching as well due to "pain in my knees, . . . arthritis, and . . . nerve damage" in her "lower back." (Tr. 107). As a result of these symptoms, Oslin denied an ability to carry out household tasks, bathe, or dress "when my lower back is real bad." (Tr. 107-08). "I do manage, but there are days where I just stay in my pajamas. I don't dress at all if I'm having a particularly bad day." (Tr. 108). On occasion, she simply drove to "a Kroger store right down the street" for "frozen dinner, or a loaf of bread, . . ." (*Id.*).

To alleviate her symptoms, Oslin took Norco, Flexeril and Pamelor, all of which "really knocks me out, and I definitely can't do anything, you know, concentrating. It would be difficult to read a book or anything of that nature." (Tr. 109). Since August 2012, she was hospitalized at "McLaren" for "pleurisy of my lungs," surgery on a "deviated septum," "a heart catheter procedure," as well as "trouble with the wound in my groin." (Tr. 110). When suffering from depression, she engaged in talk therapy for a short while but found it unavailing, and "quit going, . . ." (Tr. 111). She also received "shots in my lower back" to treat her pain, but as "those were not very effective," she was "referred . . . to Dr. Palavali" who said "I would need back surgery." (*Id.*).

When she gave two-weeks notice to her employer in March 2013, she indicated that she "just couldn't take [the pain] anymore" because "it was getting worse." (Tr. 114). "I'm literally on the couch flat out watching TV. I really don't even pay attention to the shows. I just have it on for the noise, and I get up when I'm comfortable and walk around, and then I'm right back on the heating pad. That's basically my life now." (Tr. 115). Nor did Oslin feel comfortable on her feet, as her "left knee will give out on me and that's when I fall, . . ." (Tr. 116). In all, she spent a total of "eight hours" daily on the couch. (Tr. 117). About five times a week, she got pain "all over" and could not tolerate even the touch of "a blanket . . . ." (*Id.*). "[I]rritable bowel syndrome" and "diverticulitis, . . . almost every night" exacerbated her pain. (*Id.*). When she quit, her lower back pain had hit its "boiling point . . . ." (Tr. 118).

### iii.    The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of the VE to determine Oslin's ability to work. (Tr. 119). The VE first clarified some characteristics of jobs Oslin held in the past, namely: "[b]artender," "dental assistant," "[r]oute driver," "cook/waitress," "cook helper," and "waitress." (Tr. 120). A bartender job was either light or medium semi-skilled work. (Tr. 121-22). Waitress and cook/waitress qualified as light semi-skilled work. (Tr. 122). Cook helper was medium unskilled work. "[O]ffice clerk"—equivalent to dental assistant—qualified as sedentary semi-skilled work. (Tr. 122).

In her first hypothetical, the ALJ asked the VE to "[a]ssume a person limited to sedentary work . . . . [who] should not need to climb ladders, ropes or scaffolds, can only occasionally climb stairs, balance, stoop, kneel, crouch or crawl. There should be no

concentrated exposure to hazards. Assume a limitation to simple, routine, repetitive work, but is not done at a production rate pace. For example, there should be no assembly line work. There should be only minimal changes in the work setting. There should be only occasional routine contacts with coworkers, supervisors and the public." (Tr. 123). The VE indicated that such a person could not perform any of Oslin's prior work. (*Id.*). However, she also suggested other jobs fit for such a person, such as certain "bench assembly positions"—with 30,000 national job availabilities—and "hand packer positions"—with 52,000 national job availabilities. (*Id.*). The ALJ then added: "If you assume that the person should be able to alternate from the sitting position for up to five minutes approximately every 30 minutes, could that person do this job?" (*Id.*). The VE said "[y]es, with the same numbers." (Tr. 124). She also indicated that the assembly and packer jobs did not require interaction with the public, while the "general office clerk position" required "no more than occasional" or "rare" interaction with the public. (*Id.*).

All said positions also required "the person to perform the work duties eight hours a day, five days a week in a typical work schedule, . . ." (*Id.*). No more than "one absence per month on average," or twelve per year, would be tolerated. (Tr. 124-25). However, "the current trend tends to be any absences, in some situations any tardies even in the first 90 days could result in termination." (Tr. 125). No number of "unscheduled work breaks" to "lie down throughout the workday" would be permitted. (*Id.*). And an individual limited to "occasional handling or reaching" could not acquire competitive employment in any job the VE listed. (Tr. 126).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both    "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20

14

C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;
(ii)   The location, duration, frequency, and intensity of . . . pain;
(iii)  Precipitating and aggravating factors;
(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)    Treatment, other than medication, . . . received for relief of . . . pain;
(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

15

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

In the instant case, there was a prior decision denying benefits on August 13, 2012. In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases.

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSAR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing where "res judicata applied in that we have a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957,

416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d Cir. 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (discussing the "collateral estoppel branch of res judicata" in social security cases). Claim preclusion prevents reviewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive: "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Purter*, 771 F.2d at 689 n.5.

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review."). The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond*. *See Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier

decision. *See Bailey ex rel. Bailey v. Astrue*, No, 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof of changed circumstances. Thus, as applied in this Circuit, the SSAR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5: 12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*." (citing *Slick v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 U.S. Dist. LEXIS 3653, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009))); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

    In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 843; *see also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that

she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained. "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey*, 987 F.2d at 1232-33. Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988,

at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at *4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *See* 2011 WL 4502988 at *2, 8-9. These decisions make clear that the relevant change in circumstances is not a change in the availability of evidence but a change in Plaintiff's condition.

*Res judicata* is not a complete bar on reconsidering prior decisions or determinations: the regulations provide two mechanisms for such reexamination that escape the doctrine's effects. *Purter*, 771 F.2d at 691-93 (discussing reopening as an exception to claim preclusion). The first, less important to *res judicata* case law, occurs just after the initial determination, when the claimant's first step in the review process is sometimes a request for "reconsideration" of that decision. 20 C.F.R. §§ 404.907, 416.1407.

The more critical and complicated mechanism is reopening a prior ALJ decision. The regulations allow the Commissioner, through an ALJ or Appeals Council, to peel back the determination or decision and revise it. 20 C.F. R. §§ 404.987, 404.992, 416.1487, 416.1492. The claimant or the Commissioner can initiate the process. *Id.* The reopening of a determination or decision can occur "for any reason" within twelve months of the notice of the initial determination, but "good cause" must exist if the reopening occurs within two years of the initial determination for SSI claims and four years for DIB claims. *Id.* §§ 404.988, 416.1488. A DIB claim can also be reopened at any time under a few scenarios not relevant to the instant case. *Id.* § 404.988(c). Good cause

20

exists, among other reasons, if "[n]ew and material evidence is furnished" for either type of claim, SSI or DIB. *Id.* §§ 404.989, 416.1489. If a determination or decision is reopened, *res judicata* does not apply. *Kaszer v. Massanari*, 40 F. App'x 686, 690 (3d Cir. 2002). Neither party argues that the prior decision was reopened and neither party makes their arguments under the *res judicata* standards. I therefore, will consider the arguments as made by the parties.

### G.      Analysis

In her brief, Oslin presents four distinct arguments: (1) the ALJ ignored material evidence and failed to order a follow-up consultative examination in light of new and material evidence, as required by SSR 96-6p, (Doc. 14 at ID 641-46); (2) the ALJ violated the treating physician rule by improperly discounting Dr. Fayyad's opinion, (Doc. 14 at ID 647-50); (3) the ALJ wrongfully discounted her credibility, (Doc. 14 at ID 652-54); and (4) the ALJ's reasoning does not adequately lay an evidentiary foundation for the RFC, (Doc. 14 at ID 650-52). I address each argument in turn.

#### 1.      Step Three Assessment

Oslin first contends that the ALJ "ignored evidence" that her "spinal condition does result in compromise of a nerve root" at Step Three, when determining whether she met or equaled "the criteria to establish disability pursuant to Social Security Listing 1.04, . . ." (Doc. 14 at ID 641). Further, the ALJ issued her determination "without an updated medical advisory opinion . . . on the issue of equivalency"—this constituted error because, as Oslin alleges, the state agency physician, Dr. Choi, "did not have the opportunity to review updated, material evidence from [Oslin's] neurosurgeon, dated

21

March 26, 2013," and thus SSR 96-6p required the ALJ to acquire an updated medical advisory opinion. (Doc. 14 at ID 641-42). In light of such defects, Oslin decries the ALJ's Step Three findings as "tainted" and without "substantial evidentiary support." (Doc. 14 at ID 641).

At Step Three, the ALJ remains both "responsible for deciding the ultimate legal question [of] whether a listing is met or equaled," and obligated "to receive expert opinion evidence of a physician or psychologist into the record *before* making an equivalency determination." *Park v. Comm'r of Soc. Sec.*, No. 14-10982, 2015 WL 5697608, at *2 (E.D. Mich. Sept. 29, 2015) (quoting SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996)) (internal quotation marks omitted). "When additional medical evidence is received that in the opinion of the [ALJ] . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments," the ALJ "must obtain an updated medical opinion from a medical expert . . . ." SSR 96-6p, 1996 WL 374180, at *3-4 (July 2, 1996). At the time the ALJ rendered her decision, demonstrating a disorder of the spine required showing "[e]vidence of nerve root compression characterized by [i] neuro-anatomic distribution of pain, [ii] limitation of motion of the spine, [iii] motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, [iv] if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); . . ." 20 C.F.R. § 1.04 Pt. 404, Subpt. P, App'x 1 (effective Feb. 26, 2014 to Dec. 8, 2014).

Oslin correctly notes that the ALJ did not expressly discuss Dr. Palavali's examination records. This alone does not present an issue, as "[i]t is axiomatic that an ALJ need not discuss every piece of evidence in the record." *Dinicola v. Comm'r of Soc. Sec.*, No. 14-CV-13937, 2015 WL 5675075, at *3 (E.D. Mich. Aug. 31, 2015) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006)). But the ALJ's opinion reveals that she did not in fact *consider* Dr. Palavali's examination records either. She remarks, for instance, that "the undersigned did not find evidence in the record that surgery has been recommended," (Tr. 89), even though Dr. Palavali plainly recommended surgery in Exhibit 17F. (Tr. 584) ("I told the patient that I would recommend L4-L5 interbody fusion and pedicle screw and rod fixation after decompression, . . . She understands this, wants to think about it and decide. If she decides to go ahead with surgery, she will call us."). Numerous records suggest that conservative treatment provided no relief. *E.g.* (Tr. 357) (July 10, 2012: "I am disappointed in her poor response to treatment. I had switched from the lumbar approach to the caudal approach, but neither approach seemed to provide effective relief."); (Tr. 365) (September 25, 2012: "Patient has had Epidural steroid injections but not much pain relief."); (Tr. 584) (March 26, 2013: "Patient with mechanical low back pain and clinical left L5 radiculopathy that has failed conservative treatment."). Though the record contains *little* evidence of nerve root compromise or impaired sensation, reflexes, and motor functioning, the ALJ's frequent assertion that it contained "no [such] evidence" proves mistaken. (Tr. 90-92); *see* (Tr. 584) ("Lumbar MRI shows a disc prolapse with nerve root compromise on the left side at L4-L5 as well as moderate disc degeneration.");

(Tr. 415-16) (registering a positive straight leg raise test, "[i]mpaired" musculoskeletal strength, and impaired range of movement in the lumbar spine); (Tr. 447) (finding "decreased ROM" and "muscle spasm" in the lumbar spine); (Tr. 511) ("ROM of the back is somewhat limited due to pain."). The ALJ's failure to consider this evidence constitutes error.

The Commissioner no doubt will argue that any such error worked no harm on Oslin. As the Commissioner notes, "Dr. Palavali subsequently recommended—based on the 2014 MRI—that [Oslin] should *not* have surgery on her lumbar spine." (Doc. 17 at ID 682); (Tr. 54). In addition, "the State agency physician explicitly considered the 2012 MRI before opining that [Oslin] did not meet or equal Listing 1.04A . . . ." (Doc. 17 at ID 677); (Tr. 153-54). Dr. Palavali's opinion, however, addressed each aspect of Listing 1.04: "Lower extremity examination is *positive for straight-leg raising test* . . . . Normal strength *except left dorsiflexion* which is 4/5. *Sensation is slightly decreased* to pinprick over the outside of left leg and foot. Her *gait is remarkable* for difficulty to do heel walk on the left side. *Lumbar flexion is limited* to 40 and extension to 10 degrees respectively. Lumbar MRI shows a *disc prolapse with nerve root compromise* on the left side at L4-L5 as well as *moderate disc degeneration*." (Tr. 584) (emphasis added). That Dr. Palavali later disclaimed the need for surgery fails to undermine the significance of his March 2013 findings, for his later statements simply suggest that "her low back pain is not bad enough to consider surgery," a fact not bearing directly on whether her condition met Listing 1.04. Moreover, Dr. Palavi's later statements post-date the ALJ's decision, and thus escape review on appeal. *Accord Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 717

(6th Cir. 2013) ("Our substantial-evidence review of the ALJ's decision does not consider new evidence submitted after that decision is rendered."). That the Commissioner can point to "multiple findings that squarely preclude" Oslin's claim to meet Listing 1.04 only serves to illustrate a conflict in the medical evidence, and this Court remains ill-equipped to settle such conflicts. *Accord Swift v. Sec'y of Health & Human Servs.*, 904 F.2d 36, at *2 (6th Cir. 1990) ("It is the duty of the ALJ to weigh and resolve conflicts in the medical evidence."). In this sense, the ALJ's oversight imperiled her Step Three inquiry into whether Oslin met Listing 1.04. *Cf. Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, (6th Cir. 2007) (noting the "[c]hief" requirement "that all determinations be made based upon the record in its entirety").

The ALJ's Step Three equivalency analysis proves similarly defective. Had the ALJ given some indication that she considered Dr. Palavali's notes, I could say with confidence that she decided such evidence would not alter the state agency consultant's equivalency finding, thereby relieving her of any duty to obtain an updated medical opinion under SSR 96-6p. But the ALJ did not consider Dr. Palavali's notes. And this Court may not estimate what impact her consideration might have had on the decision-making process, particularly because Dr. Palavali's notes suggest conflict among medical sources in the record. *E.g.*, *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 371 (6th Cir. 2006) ("The court may not . . . resolve conflicts in evidence, or decide questions of credibility."); *accord Obeshaw v. Comm'r of Soc. Sec.*, No. 1:08-cv-559, 2010 WL 955613, at *9 (W.D. Mich. Mar. 15, 2010) ("It is the ALJ's job to resolve conflicting medical evidence."); *cf. Comeau v. Comm'r of Soc. Sec.*, No. 15-10650, 2016 WL

1253315, at *9 (E.D. Mich. Mar. 30, 2016) ("The Court is ill equipped to play the role of the ALJ").[2]

For these reasons, the ALJ's Step Three analysis is fatally defective and requires remand.[3]

## 2.      Dr. Fayyad's Opinion

Oslin next suggests that the ALJ cited to, but "superficially reject[ed]" Dr. Fayyad's opinion, claiming falsely that "the record did not demonstrate nerve root compromise," and neglecting the substantial record evidence consistent with Dr. Fayyad's opinion, particularly Dr. Palavali's opinion. (Doc. 14 at ID 649). "The ALJ cannot reject, even in part, a treating physician's opinion, based upon [a] significant mischaracterization of the medical opinion evidence of record." (*Id.*).

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 404.1527(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole,

---

[2] The ALJ accorded the state agency consultant only "limited weight" to begin with, (Doc. 92), and the contrasting evidence at issue flows from a neurosurgeon with specialized knowledge of the lumbar spine. Remand on these facts is thus anything but superfluous.

[3] The Commissioner might alternatively argue that any Step Three error was "rendered harmless" because the subsequent RFC assessment accounts for the entire range of Oslin's symptoms. *Bertuzzi v. Comm'r of Soc. Sec.*, No. 5:15-cv-11623, 2016 WL 4706935, at *8 (E.D. Mich. June 24, 2016). Indeed, the RFC provides for "occasional climbing, balancing, stooping, crouching, kneeling, and crawling" to accommodate Oslin's degenerative disc disease. (Tr. 88). Nevertheless, I cannot say for certain that the ALJ's Step Three error is harmless because "at this juncture, [I] cannot say that, if the ALJ had made the required findings at Step Three, she necessarily *would have* found that [Oslin] did not meet or medically equal the relevant Listing. And, if [the ALJ] does find that the evidence establishes medical equivalence, then [Oslin] would be presumptively entitled to benefits." *Andrews v. Comm'r of Soc. Sec.*, No. 12-13111, 2013 WL 2200393, at *14 (E.D. Mich. May 20, 2013) (internal citation omitted). For this reason, any such argument as to the error's harmlessness should not prevail.

*id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). In weighing a treating source statement, the ALJ considers the length of the treatment relationship and frequency of examination, as well as the nature and extent of the treatment relationship. *Id.* § (c)(2)(i)-(ii). Where a treating source's opinion proves "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it "controlling weight." *Id.* § (c)(2). In any case, the Commissioner "will always give good reasons. . . for the weight we give [a] treating source's opinion." *Id.*

In dismissing Dr. Fayyad's opinion, the ALJ generally cited internal inconsistency and lack of continuity with "objective evidence." (Tr. 92). To the extent the ALJ discredited Dr. Fayyad's opinion on the grounds of internal inconsistency, no error lies. But because, as noted above, the ALJ failed to consider perhaps the most significant conflicting evidence on record—and found (again) "no evidence of spinal cord or nerve root compromise"—the ALJ's analysis is partially flawed.

Such error, nevertheless, proves harmless. As the Commissioner contends, "the Fayyad Letter is too vague to lend any insight into [Dr. Fayyad's] opinions as to [Oslin's] specific abilities." (Doc. 17 at ID 680) (internal citations and quotation marks omitted). Dr. Fayyad provided only that Oslin "needed to lie down as needed throughout the day due to the severity of her lumbar pain and radiculopathy from March 2013 to the

27

present." (Tr. 586). He does not detail, or even speculate as to, exactly how much time per day this might occupy, or to what extent this might interfere with Oslin's capacity to work. *Cf. Beavers v. Comm'r of Soc. Sec.*, No. 14-CV-12305, 2015 WL 3967055, at *4 (E.D. Mich. June 30, 2015) ("[T]he only functional limitation on which the ALJ could rely is [the doctor's] opinion that Plaintiff should 'limit his activities.' This vague, general statement provides no basis upon which the ALJ could have derived functional limitations." (internal citation omitted)).

### 3.       Credibility Analysis

Characterizing the ALJ's credibility analysis as "a generalized rejection of [her] credibility" without "specifics," Oslin asks for remand, suggesting that "[w]here an ALJ's underlying reasoning to discount a claimant's credibility is even partially flawed, remand is appropriate." (Doc. 14 at ID 652-53). As support, Oslin cites record evidence she suggests prove that she suffered "from nerve root compromise" and had been recommended surgery (non-conservative treatment) contrary to the ALJ's "mistaken belief . . . ." (Doc. 14 at ID 653-54).

The ALJ's analysis flows as it should under 96-7p, but for reasons discussed above, her ultimate conclusion remains tainted. The ALJ first noted that objective medical evidence did not substantiate Oslin's statements as to her symptoms' severity. (Tr. 89-90). Where an ALJ finds such a void, 96-7p requires her to "make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). To this end, the ALJ provided several legitimate reasons as to why Oslin's statements "are not entirely

credible," (Tr. 90-91) (noting, among other things, that Oslin never sought mental health care, was often recommended conservative treatment for her physical symptoms, and "did not report" a disabling "degree of limitation to her doctors"). But the ALJ's failure to consider Dr. Palavali's notes jeopardizes her finding that "[t]he degree of limitation alleged is not supported by objective medical evidence." (Tr. 91). In other words, though the ALJ's credibility assessment does not contain familiar pitfalls—such as "blanket assertions" against Oslin's veracity—it imperfectly addresses whether the entirety of the objective evidence "tends to support the [her] credibility . . . ." *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011). On remand, the ALJ must ensure she considers the complete record in evaluating Oslin's subjective symptoms of pain.

### 4.      RFC Assessment

Oslin last complains that the ALJ's decision "does not even minimally explain the evidentiary basis for the RFC determination, and the explanation and interpretation of the evidence that is provided is not supported by substantial evidence." (Doc. 14 at ID 650). Because the ALJ did not perform "a function-by-function evaluation of [Oslin's] work-related abilities"—and generally "failed to provide a logical bridge . . . between the cited evidence and the RFC determination" as SSR 96-8p demands—Oslin implores the Court to remand this case. (Doc. 14 at ID 650-51).

Contrary to Oslin's claims, the ALJ's opinion generally provides a "logical bridge" between the evidence evaluated and the RFC—the issue at hand is that a small evidentiary island (Dr. Palavali's notes) lies disconnected from it. I therefore suggest that because the ALJ failed to consider the entire record, substantial evidence does not

support her RFC findings. On remand, the ALJ can remedy this defect by accounting for the entirety of the record evidence.

### H.      Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Oslin's Motion for Summary Judgment, (Doc. 14), be **GRANTED**, the Commissioner's Motion, (Doc. 17), be **DENIED**, and this case be **REMANDED** to the Commissioner under sentence four of 42 U.S.C. § 405(g).

### III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 24, 2017                                    S/ PATRICIA T. MORRIS
                                                           Patricia T. Morris
                                                           United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 24, 2017                              By s/Kristen Castaneda
                                                    Case Manager